IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

JULIE A. BUGELLA,

                         Plaintiff,                     OPINION AND ORDER

          v.                                     07-C-269-C

MICHAEL J. ASTRUE,
Commissioner of Social Security,

                         Defendant.

---

This is a social security appeal brought pursuant to 42 U.S.C. § 405(g). Plaintiff Julie A. Bugella applied for Disability Insurance Benefits and Supplemental Security Income under sections 216(i) and 223 and 1614(a)(3)(A) of the Social Security Act, codified at 42 U.S.C. §§ 416(i), 423(d) and 1382c (3)(A), alleging that she had been disabled since July 30, 2000. After two denials by the local disability agency, plaintiff requested the social security administration to review her applications *de novo*. After a hearing at which plaintiff appeared and testified, an administrative law judge issued a decision finding plaintiff disabled as of March 1, 2005, but not before that date. That decision became the final decision of the commissioner when the Appeals Council denied plaintiff's request for review. Plaintiff now appeals the unfavorable portion of the administrative law judge's decision, contending that the administrative law judge's finding that plaintiff was first disabled on March 1, 2005 was arbitrary, poorly explained and not supported by substantial evidence. Plaintiff maintains that she was disabled as of July 30, 2000.

I am rejecting plaintiff's argument and affirming the commissioner's decision.  Her claim that she was disabled on July 30, 2000 is not supported by substantial evidence and she has not argued in favor of any other onset date.  Although the administrative law judge's rationale for selecting March 1, 2005 as the onset date is not as clear as it could have been, it is clear enough.  I am satisfied that substantial evidence in the record supports the determination that plaintiff was disabled on March 1, 2005.

The following facts are drawn from the administrative record ("AR").

FACTS

I. <u>Background and Medical Evidence</u>

Plaintiff was born on July 15, 1960.  She has a high school education.  She worked at the Brookfield Zoo in Illinois from 1978 until June 2000, beginning as a janitor and working her way up to program coordinator.  Her last insured date for the purpose of Disability Insurance Benefits was December 31, 2006.

In 1996, plaintiff underwent a spinal fusion at L4-L5 and L5-S1.  She returned to work after she recovered.  In June 2000, she went on medical leave to have surgery on her right shoulder.  The surgery was performed by Dr. E. Boone Brackett.  In October 2000, Dr. Brackett indicated that plaintiff was having recurrent problems with her right shoulder that prevented her from doing prolonged computer work, which was a requirement of her job at

the zoo.  In December 2000, while she was still on leave, the zoo notified her that her position had been eliminated.

On May 31, 2001, Dr. Brackett noted that plaintiff was no longer having problems with her right shoulder, but was having trouble with the left.  In December 2001, Dr. Brackett operated on plaintiff's left shoulder.

From 2001 to roughly 2002, plaintiff received routine care from her primary physician, including medication prescriptions for diabetes, anxiety and situational stress associated with having to care for an elderly aunt suffering from dementia.  Although plaintiff had some complaints of pain, including a thoracic strain on April 30, 2001 and complaints of left shoulder pain and stiffness in February 2002, for the most part plaintiff's medical records from 2001 to 2002 show no significant medical problems.

On March 21, 2002, plaintiff saw her primary physician, Dr. Lawrence Carlson, for complaints of lower back and hip pain following a fall on the ice.  Dr. Carlson diagnosed a lower back strain and prescribed Lortab (a combination of acetaminophen and hydrocodone) and Soma (a muscle relaxer).  At a follow-up visit on April 15, 2002, plaintiff said she still had lower back pain on the left that sometimes radiated down her left leg.  She was out of pain medication but not ask for a refill.  Dr. Carlson referred plaintiff to orthopedics.

On May 3, 2002, plaintiff was evaluated by Dr. Paul Johnston and his assistant, Daniel Ritzke.  On examination, plaintiff had some tenderness in the left paraspinal muscles

and decreased trunk range of motion, with a significant amount of pain associated with forward flexion.  However, the remainder of the examination was normal.  Plaintiff had normal reflexes, strength and pulses in the lower extremities, negative straight leg raising and a steady gait and was able to toe, heel and tandem walk without difficulty.  Johnston and Ritzke diagnosed plaintiff with back pain, prescribed Darvocet and recommended that she stop smoking.

Plaintiff saw Dr. Daniel Lochmann, an orthopedic surgeon, on May 15, 2002. Plaintiff reported having pain in her lower back since her fusion in 1996, describing her pain as ranging between 4 to 6 on a 10-point scale.  She also reported pain in other joints including her shoulders, hips and elbows.  On examination, plaintiff was able to flex forward and extend approximately 20 degrees without significant difficulty.  She had no weakness with toe raising and only lower back pain with straight leg raising.  Dr. Lochmann reviewed x-rays of plaintiff's lumbar spine and noted that they showed a solid fusion with no motion at the site.  He indicated that plaintiff was neither a candidate for nor interested in surgery. He referred her to Dr. Eric Carlsen, a physical medicine specialist, for rehabilitation.  For plaintiff's other joint complaints, Dr. Lochmann prescribed Bextra, an anti-inflammatory medication.

Plaintiff saw Dr. Carlsen on May 20, 2002.  Plaintiff reported that in addition to her chronic lower back pain, she had recently been experiencing acute pain on the right radiating

4

into her right leg.  She said that she was not sure what had caused the pain but reported that she was doing a fair amount of gardening.  Like Dr. Lochmann, Dr. Carlsen observed no significant abnormalities during his examination of plaintiff.  In his opinion, plaintiff was deconditioned.  He encouraged plaintiff to stop smoking, get more aerobic exercise and participate in a short course of physical therapy to review some lumbar stabilization exercises.

At a follow-up visit on June 5, 2002, plaintiff told Dr. Carlsen that her acute pain had resolved and she was close to her baseline.  She requested a refill of Darvocet, indicating that she took it twice a day and found it to be the only medication that allowed her "to do what she wants to do including garden, etc."  AR 301.  Plaintiff was riding her bike 20 minutes a day and working on basic exercises prescribed by her physical therapist.  Dr. Carlsen indicated that a trial of Neurontin would be helpful, but plaintiff noted that her insurance would not pay for it.

On September 11, 2002 plaintiff reported that she had had a flare-up of her back and hip pain after falling while loading her truck in preparation for a short vacation.  Plaintiff reported that Darvocet was the only thing she had found to help relieve the pain.  She admitted that she had not been doing her home exercises regularly.  Dr. Carlsen noted that plaintiff's gait was relatively normal, her reflexes and strength were intact and straight leg raising was negative.  Dr. Carlsen indicated that he would like to find a medication different

from Darvocet for plaintiff to use, noting that plaintiff was trying to reenter the workforce in some type of management job. He recommended that plaintiff see her physical therapist to review her home exercise program and talked to plaintiff about the importance of weight loss, smoking cessation and general exercise.

Plaintiff was evaluated by physical therapist Melissa Ross on September 17, 2002. Plaintiff reported that most of her pain occurred while standing. She said she had four dogs and "spends most of her day cleaning, taking care of the dogs, gardening, riding bike or canning, but she does not sit in front of the TV." AR 273. Ross educated plaintiff on proper body mechanics and prescribed a set of home exercises.

On October 2, 2002, plaintiff saw Dr. Carlsen with a new complaint of left wrist pain that she did not think was related to her fall from the truck. Dr. Carlsen detected tenderness but no significant swelling. X-rays of the wrist were normal. Dr. Carlsen recommended that plaintiff see a rheumatologist; however, there is no evidence that plaintiff did so at that time.

At a follow-up visit with Dr. Carlsen on December 4, 2002, plaintiff reported that her pain was about the same as always. She said the Bextra had helped a lot with her wrist and shoulder pain but she was concerned that it had caused her face to break out. Plaintiff's gait was normal and she had 5/5 strength in the lower extremities. In his office note, Dr. Carlsen reported that although plaintiff had tried a broad range of conservative management, her pain had not really decreased and he had nothing more to offer her. He indicated that it was

6

probably not realistic for plaintiff to discontinue taking Darvocet, noting that she took a low dosage which "seems to hold her in check fairly well from a pain management standpoint." AR 290-91.  He encouraged plaintiff to keep taking Bextra, indicating that he was not convinced that her breakout was an allergic reaction to the drug.  He also recommended that she continue with her home exercise program and increase her aerobic activity.

Plaintiff received no further care from Dr. Carlsen.  Plaintiff saw her primary physician, Dr. Carlson, on February 18, 2003 and June 12, 2003 for a physical exam and prescription refills, respectively.  On September 10, 2003, she  saw Dr. Carlson and reported having increased lower back pain and pain down the back of her left upper leg after stepping in a hole.  Neurological exam was basically negative.  Dr. Carlson ordered an MRI, which showed multi-level disc degeneration as well as severe L4-5 facet arthropathy, scoliosis and scattered areas of stenosis, but nothing that was obliterating the foramen, lateral recesses or central canal.

Plaintiff began receiving low-cost treatment at the Northwoods Community Health Center in Minong, Wisconsin, in February 2004.  Although some of her visits were for problems unrelated to her disability claim, in July 2004 she reported to her primary physician, Dr. Nina Gilberg, that she had pain in her neck and upper back that was different and more debilitating than her typical lower back pain.  She also had periodic numbness in her hands, primarily at night.  Plaintiff reported being very uncomfortable and sleeping

poorly.  On physical examination, plaintiff had decreased range of motion in the neck and tenderness in various places in her neck and back, although her reflexes and strength were normal.  Dr. Gilberg indicated that she wanted to get an MRI or CT scan of plaintiff's neck but it depended upon whether public funds were available.  She prescribed Flexeril.

In September and October 2004, plaintiff reported that she continued to have significant pain in her neck, upper and lower back and legs and numbness in her arms.  She had been unable to obtain an MRI or CT scan because of a lack of funds.  She was taking two Darvocet daily for pain.  She reported that she was staying with an elderly man and caring for him in exchange for room and board.  She said she tried to walk and keep active. In November 2004, Dr. Gilberg wrote a prescription for Percocet for plaintiff to take as needed for pain.

In connection with her application for social security benefits, plaintiff was evaluated by Dr. Neil Johnson on October 14, 2004.  Plaintiff reported pain in her back, hips and shoulders.  She reported that she could walk 3/4 of a block, stand three to five minutes and sit 20 minutes.  She said she could lift at least five pounds but could not do anything overhead, push or pull.  She could fasten a button and pick up a coin.  Dr. Johnson noticed that plaintiff walked with a small stepped gait and appeared to be in a lot of pain.  On physical examination, plaintiff had mild difficulty getting on and off the examination table, mild difficulty heel and toe walking, moderate difficulty squatting and moderate difficulty

hopping.  She had 5/5 strength in her legs, 4/5 strength in her shoulders and symmetrical reflexes.  Range of motion testing produced pain in the neck, back, shoulders and hips, with plaintiff limited mostly in her ability to flex her lumbar spine.  Dr. Johnson concluded that plaintiff had the following impairments:  a significant pain syndrome and loss of motion in the lumbar spine associated with her history of back injury and surgery; pain and mild weakness in both shoulders; and bilateral hip pain with loss of motion.

On January 19, 2005, plaintiff had MRI scans of her cervical and lumbar spine.  They showed multilevel degenerative changes in the cervical and lumbar spine, including moderate to severe narrowing of the left foramen at L2-L3 and the right foramen at L3-L4 and mild to moderate central canal narrowing at C6-C7.  Dr. Gilberg reviewed the MRI with plaintiff on February 2, 2005.  Plaintiff continued to report severe back pain and a lot of numbness and weakness in her upper extremities, as well as generalized pain in her pelvic girdle.  Dr. Gilberg renewed plaintiff's prescriptions for Darvocet, Flexeril and Percocet and recommended that she see a neurosurgeon.

On March 9, 2005, plaintiff told Dr. Gilberg that she had generalized aches all over that were not accompanied by any redness, warmth or swelling.  She said this was different from her neck and arm pain.  Dr. Gilberg noted that plaintiff was tender to palpation.  On March 16, 2005, plaintiff was evaluated by Dr. Mark Glazier, a neurosurgeon.  Dr. Glazier reviewed plaintiff's MRIs and found no single abnormality that would clearly explain

plaintiff's symptoms.  He recommended that plaintiff be given a home cervical traction unit, continue to use anti-inflammatory medication, have an EMG of her upper extremities and see a rheumatologist.

In May 2005, plaintiff told Dr. Gilberg that her chronic pain was still a significant problem, especially in her elbows and wrists.  She also reported soreness in her right thumb. Plaintiff was still caring for the elderly gentleman in exchange for room and board.  Dr. Gilberg noted that plaintiff's right wrist was slightly swollen.

On August 3, 2005, plaintiff was seen by Dr. Ana Fernandez, a rheumatologist. Plaintiff reported having had back pain for 11 years.  In addition, she reported newer symptoms of muscle pain, lack of restful sleep and more recently pain in the right wrist and the right thumb.  Plaintiff reported that she was unable to bend the right thumb at all or the left thumb at times and that the tips of the fingers on her left hand were numb.  On physical examination, plaintiff had diffuse tenderness at various sites consistent with fibromyalgia trigger points and some swelling in the right wrist.  Dr. Fernandez indicated that plaintiff had three problems:  1) chronic back and neck pain caused by degenerative disc disease; 2) myofascial pain with a lack of restful sleep and depression, consistent with fibromyalgia syndrome; and 3) joint pain in the right wrist and right thumb, the cause of which was unknown but which might be inflammatory arthritis.  Dr. Fernandez recommended that

plaintiff see a physical medicine specialist for her neck and back pain and take medication to treat the possible inflammatory arthritis.

Nerve conduction studies performed on August 10, 2005 indicated that plaintiff had a borderline carpal tunnel syndrome in her right wrist.

## B. Residual Functional Capacity Assessments

On July 12, 2004, Dr. Carlsen completed a residual functional capacities questionnaire about plaintiff.  He indicated that plaintiff could walk two blocks; sit 30 minutes at a time for a total of four hours of an eight-hour day; stand 15 minutes at a time for a total of two hours of an eight-hour day; frequently lift 10 pounds or less; and rarely twist, stoop, crouch or climb ladders.  He indicated that plaintiff had significant limitations in performing repetitive reaching, handling or fingering, but he did not complete the section of the form asking him to specify the percentage of time that plaintiff could perform such activities. Dr. Carlsen also noted that plaintiff would need a five-minute rest break every hour and that her pain would frequently interfere with the attention and concentration required to perform even simple work tasks.  However, he indicated that plaintiff was capable of low stress jobs.

On December 14, 2004, a consulting psychiatrist for the local disability determination service reviewed plaintiff's file and concluded that she had the mental

11

capacity to perform simple, routine, low stress work that was within her physical limitations. On December 18, 2004, a consulting physician for the local disability determination service performed a similar review and determined that plaintiff was capable of performing sedentary work with occasional balancing, kneeling, or crouching and limited reaching or lifting overhead with either arm. The physician indicated that he or she had reviewed Dr. Carlsen's July 12, 2004 residual functional capacities assessment but did not agree with it, noting that Dr. Carlsen had not seen plaintiff since December 2002 and therefore his opinions were not based upon any recent observations of her. Nonetheless, noted the physician, with the exception of the limitation on sitting to four hours a day, Dr. Carlsen had given plaintiff an "essentially sedentary [residual functional capacity]." AR 353.

On March 16, 2006, Dr. Gilberg completed a residual functional capacity questionnaire pertaining to plaintiff. She indicated that plaintiff had severe limitations in her ability to work as a result of her chronic back pain, myofascial pain and inability to use her right thumb. Among other things, she indicated that plaintiff was incapable of performing even low stress jobs, would need to take unscheduled breaks to lie down for up to an hour and could not perform handling or fingering with her right hand.

C.  Administrative Proceedings

12

On December 1, 2003, plaintiff filed an application for Disability Insurance Benefits under Title II of the Social Security Act, alleging that she had been disabled since July 30, 2000 as a result of back and shoulder problems, diabetes, gastroparesis and depression. That application was denied initially and on reconsideration. On March 1, 2005, plaintiff filed an application for Supplemental Security Income under Title XVI of the Act, again alleging disability beginning July 30, 2000. That application was escalated to the hearings level so that it could be considered with her application for Disability Insurance Benefits.

An administrative hearing on both applications was convened on June 20, 2006. Plaintiff, an impartial medical expert and an impartial vocational expert testified. Plaintiff was represented by a lawyer.

Plaintiff testified that during the last one to two years while she was working, she had a manager that allowed her to work from home frequently because of her health problems. She stopped working in June 2000 because she went on medical leave to have shoulder surgery. While on leave, she was laid off permanently from her position. She received severance pay, reporting earnings in excess of $25,000 in 2001. She did not return to work thereafter. However, for two to three months in 2004, she received room and board in exchange for living with and caring for an elderly man who had had hip replacement surgery.

During his questioning of plaintiff, the administrative law judge noted that from his review of the records, it appeared that plaintiff's condition had become increasingly worse

13

over the time period at issue, a statement with which plaintiff agreed.  AR 528.  When asked to rate her problems, plaintiff indicated that her most severe problem was her back pain, next was pain going down her legs and last was shoulder, arm and finger pain.  Plaintiff testified that she had had the arm and finger problems for "about a year" and that those problems had prompted her doctor to send her to a neurosurgeon.  AR 534.  In response to questions by the administrative law judge, plaintiff then described her various limitations with regard to sitting, standing, walking, lifting and fingering, indicating that her problems with fine manipulation had been going on in the past year.

After the administrative law judge finished questioning plaintiff, plaintiff's lawyer followed up with a series of questions about plaintiff's mental condition.  Among other things, plaintiff testified that she had a very low energy level.  Plaintiff's lawyer asked whether plaintiff's energy level was low at the time of her alleged onset date in 2000.  Plaintiff replied:  "Not as, not as low as what it is now, no."  AR 542.  The remainder of counsel's questions focused on plaintiff's limitations at the time of the hearing.  Apart from one question concerning plaintiff's social functioning, none of counsel's questions elicited any information from plaintiff about her pain or limitations in July 2000 or at any other points in time preceding the hearing.

Julieanne Koski, M.D., testified as an impartial medical expert.  After identifying plaintiff's various medical conditions, Dr. Koski testified that none of the impairments met

or equaled any listed impairment.  When asked to identify specific restrictions that would be appropriate for a person with plaintiff's various impairments, Dr. Koski testified that plaintiff should stand for no more than a total of two hours of an eight-hour work day; sit for a total of six hours for an eight-hour workday; have the ability to change position at least every 20 minutes; lift no more than 10 pounds and no lifting over shoulder level; never climb ladders, ropes or scaffolding and occasionally climb stairs; avoid significant vibrations or extremes of heat and cold; never perform repetitive movements or power gripping with the right hand and wrist; and perform work that was simple and routine and that required only brief and superficial contact with coworkers or the public.

On cross-examination by plaintiff's lawyer, the following exchange took place:

ATTY: Okay.  You've heard – you've reviewed the entire record and heard the testimony of the claimant today.  Her testimony as far as her limitations and the pain that she experiences, would you agree that's reasonably related to these impairments that she has?

ME:  That the pain could be a result of these impairments?

ATTY:  Yes, that they're related to her diagnosis and her –

ME:  Certainly, those diagnos[e]s – go along with, with the pain.

ATTY:  Okay.  She has a lot of medical evidence in here going back, of course to 1996 pre-onset date, and then right up through the present.  The problems that she was complaining of back to the onset date in June of 2000, when you reviewed the medical evidence at that time going forward, is her testimony consistent at that time with the medical evidence of record for 2000, 2001, 2002?

15

ALJ: I'm not sure I understand your question.  I mean, ---

ATTY: Well, there's a six year span –

ALJ: Dr. Kos –Dr. Koski's not here to analyze the claimant's credibility, Mr. Daley.

ATTY: No, I know.  I know.  I understand that, but –

ALJ: Okay.

ATTY: – under [20 C.F.R. §] 404.1529, it does say that her burden is to show that her symptoms are reasonably related to her impairment.  And you have a doctor here, who I'm asking, are her symptoms reasonably related to her –

ALJ: Dr. Koski indicated that the pain was related to the, to the impairments that she's testified about.

ATTY: Okay.  That's her testimony.

ALJ: The issue here, Mr. Daley, as we've already discussed, is when does the pain get to be such a factor that she can't do a sedentary, simple, unskilled job.  That's the issue here today.

ATTY: All right.  And that's, that's what I was trying to get to about the 2000 and 2001.  Because the medical evidence has built over time.

ALJ: Right.

AR 552-554.

Plaintiff's lawyer did not follow up with any questions of Dr. Koski about plaintiff's

condition in 2000 and 2001 or ask her to clarify whether the medical records documented

16

a worsening of plaintiff's condition.  The only other questions he asked Dr. Koski pertained to medication side effects and plaintiff's testimony regarding her need to lie down.

The administrative law judge then called Edward Utities to testify as a vocational expert.  The administrative law judge posed a hypothetical question, asking Utities to assume an individual of plaintiff's age, education and work experience who had the residual functional capacity to perform simple, unskilled sedentary work that allowed her to change position from sitting to standing every 30 minutes and required no overhead work.  Utities testified that such an individual would be unable to perform plaintiff's past relevant work but could perform unskilled clerical jobs such as charge account clerk, order clerk and callout operator, and benchwork assembly jobs, such as lens inserter, final assembler, and fishing reel assembler.  When asked whether the additional limitation of either an inability to perform repetitive firm grasping or an inability to push or pull with her arms would affect any of the jobs identified, Utities testified that neither limitation would reduce the numbers he had provided.  He indicated, however, that the vast majority of jobs he identified would require use of the hands from one-third to two-thirds of a normal workday.

On August 18, 2006, the administrative law judge issued a decision finding that plaintiff was disabled as of March 1, 2005, but not before that date.  Applying the familiar five-step evaluation process described in 20 C.F.R. §§ 404.1520 and 416.920, the administrative law judge found at step one that plaintiff had not engaged in substantial

gainful activity after March 1, 2005.  Although he noted that plaintiff's activity of caring for the elderly man in 2004 might have amounted to substantial gainful activity, he explained that it was not necessary to analyze this question because there was no evidence that plaintiff had engaged in any work activity after March 1, 2005, the date the administrative law judge found plaintiff was disabled.  At step two, the administrative law judge found that plaintiff suffered from the following severe impairments:  degenerative disc disease of the lumbar spine, status post lumbar fusion in 1996; facet arthropathy; myofascial low back pain; degenerative disc disease of the cervical spine; an endplate compression fracture; fibromylagia; a history of bilateral shoulder impingement, status post bilateral surgeries; diabetes mellitus; gastroparesis and a depressive disorder.  At step three, the administrative law judge found that none of plaintiff's impairments, either singly or in combination, met or equaled the criteria of any impairment listed in 20 CFR, Part 404, Subpart P, App. 1.

As part of his analysis at step four, the administrative law judge determined that before March 1, 2005, plaintiff retained the residual functional capacity for simple, unskilled sedentary work that required no overhead work or repetitive firm grasping and that allowed for position changes every 30 minutes.  In reaching this conclusion, the administrative law judge relied heavily on the objective medical evidence, finding that it did not "document any ongoing neurological losses, or a loss of strength secondary to her degenerative disc disease, and she received only limited conservative treatment for her low back symptoms."  AR 27.

18

He also noted that plaintiff had experienced good results from her bilateral shoulder surgeries and afterwards had only minimal shoulder symptoms.  In addition, he pointed out that the record did not document a diagnosis of fibromyalgia until August 2005.

The administrative law judge explained that in making his pre-March 2005 residual functional capacity assessment, he had given some weight to the opinions of the state agency physicians, but that he had further reduced the residual functional capacity to accommodate plaintiff's subjective complaints.  He also noted that he had given some weight to the limitations identified by Dr. Carlsen in his residual functional capacity questionnaire, which he found to be "generally consistent" with a modified range of sedentary work.  However, he declined to adopt Dr. Carlsen's findings *in toto*, noting that "the objective medical evidence prior to March 1, 2005, does not document the claimant's need to sit for no more than four hours out of an eight hour day," as Dr. Carlsen had recommended.  AR 27.  With respect to plaintiff's subjective complaints, the administrative law judge found them credible, but only with respect to the period beginning March 1, 2005.  He found that plaintiff's daily activities prior to that time were not consistent with disability, noting that plaintiff had reported during a September 2002 physical therapy session that she spent most of her days cleaning, taking care of her four dogs, gardening, riding her bike or canning produce from the garden.

The administrative law judge found that as of March 1, 2005, plaintiff was not able to perform competitive full time employment because "her symptoms increased in severity" such that she could not sustain even minimal concentration, persistence and pace. AR 28. The administrative law judge indicated that he had reached that conclusion on the basis of the objective medical evidence and the residual functional capacities questionnaire completed by Dr. Gilberg on March 16, 2006. For the period before March 1, 2005, the administrative law judge relied on the vocational expert's testimony and found that there were a significant number of jobs in the national economy that plaintiff could perform given her age, education and residual functional capacity. Accordingly, he found that plaintiff was disabled as of March 1, 2005, but not before that date.

OPINION

A.  Standard of Review

Under 42 U.S.C. § 405(g), the commissioner's findings are conclusive if they are supported by "substantial evidence." Clifford v. Apfel, 227 F.3d 863, 869 (7th Cir. 2000). Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971). When reviewing the commissioner's findings under § 405(g), the court cannot reconsider facts, reweigh the evidence, decide questions of credibility or otherwise substitute its own

20

judgment for that of the administrative law judge regarding what the outcome should be. Clifford, 227 F.3d at 869.  Thus, where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the commissioner.  Edwards v. Sullivan, 985 F.2d 334, 336 (7th Cir. 1993).  Nevertheless, the court must conduct a "critical review of the evidence" before affirming the commissioner's decision, id., and the decision cannot stand if it lacks evidentiary support or "is so poorly articulated as to prevent meaningful review."  Steele v. Barnhart, 290 F.3d 936, 940 (7th Cir. 2002).  When the administrative law judge denies benefits, he must build a logical and accurate bridge from the evidence to his conclusion.  Zurawski v. Halter, 245 F.3d 881, 887 (7th Cir. 2001).

## B.  Date of Onset

The administrative law judge determined that plaintiff became disabled as of March 1, 2005, which happens to be the date on which plaintiff filed her application for Supplemental Security Income under Title XVI of the Act.  Had plaintiff filed only this application, she would have no basis to dispute the administrative law judge's determination, for benefits under Title XVI are not retroactive.  20 C.F.R. § 416.501.  However, plaintiff also applied for Disability Insurance Benefits under Title II, which can be awarded for as many as 12 months before the month an application is filed.  20 C.F.R. §§ 404.315,

404.316.  Accordingly, once he determined that plaintiff was disabled, the administrative law judge was required to decide when the disability arose.

Social Security Ruling 83-20, 1983 WL 31249 (S.S.A.), describes the evidence an administrative law judge should consider when establishing the date of onset.  <u>Perkins v. Chater</u>, 107 F.3d 1290, 1295 (7th Cir.1997); <u>Lichter v. Bowen</u>, 814 F.2d 430, 434-37 (7th Cir. 1987).  Where, as here, the disability at issue did not arise from a traumatic injury but involves slowly progressive impairments, the administrative law judge must consider three pieces of evidence:  (1) the claimant's alleged onset date; (2) the claimant's work history; and (3) medical and all other relevant evidence.  SSR 83-20 at *2. The date that the claimant alleges as an onset date should be the starting point of the analysis and "should be used if it is consistent with all the evidence available." <u>Id</u>. at *3. The day when the impairment caused the individual to stop work is also important. <u>Id</u>.  Nevertheless, medical evidence is "the primary element in the onset determination," and the date chosen "can never be inconsistent with the medical evidence of record." <u>Id</u>. at *2, *3.

If the medical or work evidence is not consistent with the claimant's allegation, then the administrative law judge may need to develop the record further to reconcile the discrepancy.  <u>Id</u>. at *3.  Such development may be accomplished by calling a medical expert to testify or obtaining lay evidence regarding the course of the claimant's condition.  <u>Id</u>.

22

Finally, the administrative law judge must provide "convincing rationale" for the date selected.  Id.

Plaintiff argues that this case must be remanded because the administrative law judge failed to articulate a convincing rationale for selecting March 1, 2005 as the onset date of her disability.  Plaintiff points out that although the administrative law judge purported to accept the limitations identified by Dr. Gilberg in the March 16, 2006 residual functional capacity questionnaire, he failed to explain why those limitations would not have been warranted before March 1, 2005.  After all, argues plaintiff, an individual's limitations are often in existence long before a doctor completes a form describing those limitations or even before that doctor begins treating the individual.  Plaintiff also complains that the administrative law judge failed to explain why he did not adopt Dr. Koski's opinion concerning plaintiff's limitations, which were more restrictive than those found by the administrative law judge for the pre-March 2005 period.

In spite of these and other attacks on the administrative law judge's reasoning, plaintiff has not proposed any alternative to the date selected by the administrative law judge.  "SSR 83-20 does not free the claimant from her burden to prove disability within the meaning of the Act."  Briscoe ex rel. Taylor v. Barnhart, 425 F.3d 345, 356 (7th Cir. 2005).  It appears that plaintiff is adhering to her contention that her disability began on July 30, 2000, but this contention is not supported by any reasonable reading of the record.  As the

administrative law judge explained, plaintiff's claim that she was unable to perform any substantial gainful activity on that date is contradicted by the objective medical evidence from that time period, which showed relatively normal physical examinations; her treatment history, which showed limited, conservative treatment; and her daily activities, which in September 2002 were reported to consist of cleaning, taking care of her four dogs, gardening, riding her bike and canning. Plaintiff was diagnosed with fibromyalgia (a disease diagnosed largely on the basis of subjective symptoms) in August 2005, but she makes no suggestion that the all-over muscle pain and fatigue that led to that diagnosis was present in July 2000. At the hearing, plaintiff acknowledged that her condition had worsened over the years and that her ability to do things was less at the time of the hearing than it had been a year or two earlier. Further, her testimony suggested strongly that she had not left the workforce because of any permanent disability, but rather because her job had been terminated while she was on medical leave for shoulder surgery.

In light of plaintiff's testimony and the deterioration of plaintiff's condition as documented in the medical records, plaintiff's suggestion that Dr. Gilbert's March 16, 2006 opinion relates back to her condition in July 2000 is untenable. Dr. Gilbert indicated that the impairments and symptoms upon which her opinion was founded included fibromyalgia, chronic fatigue, bilateral foot pain and plaintiff's inability to use her right thumb, conditions which were not present in July 2000. The same goes for the testimony of Dr. Koski, whose

24

testimony concerning plaintiff's limitations also was based upon the combination of plaintiff's impairments as they existed *in 2006*.  Plaintiff points out that Dr. Koski testified that plaintiff's pain was reasonably related to her impairments, but that testimony does not answer the question of what plaintiff's limitations were in July 2000 or at any intervening point prior to the hearing.  Although it appears that plaintiff's lawyer might have been trying to elicit testimony from Dr. Koski on this point, he did not ask her to provide a retrospective opinion about plaintiff's limitations around the time of her alleged onset date or whether all of the conditions with which plaintiff was diagnosed in 2006 might have been present but undiagnosed in 2000.  In short, plaintiff's contention that Dr. Koski's testimony applied to the entire period of time in question is not supported by the record.

The only favorable evidence that arguably speaks to plaintiff's condition around her alleged date of onset is the residual functional capacities questionnaire completed by Dr. Carlsen, who saw plaintiff six times from May to December 2002.  (Contrary to plaintiff's assertion, Dr. Brackett's office note from October 2000 indicating that plaintiff could no longer do prolonged computer work as a result of right shoulder pain does not constitute substantial evidence of disability in July 2000.  There is no evidence to support plaintiff's assertion that she would have to hold her arms in a similar fixed position to perform the jobs identified by the vocational expert; moreover, Dr. Brackett noted in May 2001 that plaintiff was no longer having problems with her right shoulder.)  Dr. Carlsen completed the form in

July 2004, approximately one year and a half after he had last seen plaintiff and four years after plaintiff alleged she became disabled.  That time gap would have been enough reason for the administrative law judge to have questioned the reliability of Dr. Carlsen's opinion, but as plaintiff points out, the administrative law judge did not cite that reason or reject Dr. Carlsen's report.  Instead, the administrative law judge gave some weight to the report, finding that it was "generally consistent" with the conclusion that plaintiff could perform a modified range of sedentary work.

Plaintiff criticizes the administrative law judge for adopting some of Dr. Carlsen's conclusions but rejecting others, such as Dr. Carlsen's conclusion that plaintiff could sit for no more than four hours a day, but her arguments are not persuasive.  As the administrative law judge noted, the objective evidence did not document any impingement of plaintiff's spinal cord or nerves, ongoing neurological losses or loss of strength secondary to plaintiff's degenerative disc disease that would warrant a four-hour sitting limitation.  As for Dr. Carlsen's opinion that plaintiff had a limited ability to concentrate, the administrative law judge reasonably found that this limitation was not disabling insofar as Dr. Carlsen had indicated that plaintiff was capable of performing low stress jobs, plaintiff had not reported any problems concentrating while watching TV or reading and the record did not document any ongoing difficulties with concentration.  With respect to Dr. Carlsen's opinion regarding plaintiff's limitations in repetitive reaching, handling or fingering, Dr. Carlsen indicated only

26

that the problems were "significant," without defining those limitations.  The administrative law judge reasonably accommodated these limitations by limiting plaintiff to no overhead work and no repetitive firm grasping.  Overall, I am satisfied that, in arriving at his assessment of plaintiff's residual functional capacity for the pre-March 2005 period, the administrative law judge properly evaluated Dr. Carlsen's report and reasonably accounted for those limitations that were consistent with the medical and non-medical evidence in the record.  20 C.F.R. § 404.1527(d) (treating physician's opinion entitled to more weight if it is consistent with record as a whole); Hofslien v. Barnhart, 439 F.3d 375, 377 (7th Cir. 2006) (weight to be given treating physician's opinion "depends on circumstances").

Having found that the administrative law judge had good reasons to reject plaintiff's alleged onset date, the question remains whether substantial evidence exists to support his finding that plaintiff's disability began on March 1, 2005.  Defendant concedes that the administrative law judge did not provide a "meticulously detailed rationale" for choosing that date, but argues that his selection can be reconciled with the record.  According to defendant, the administrative law judge chose March 1, 2005 because it was six months after Dr. Gilberg became "aware" of plaintiff's various medical problems.  However, that rationale is neither logical nor apparent from the administrative law judge's decision.  Onset date is the first day on which a claimant's impairments prevent her from performing substantial gainful activity, not the first day on which her physician becomes aware of the full scope of her

medical problems.  Nothing in the administrative law judge's decision suggests that he relied on this specious reason for choosing March 1, 2005 as the onset date.

In spite of defendant's failed attempt to provide the backfill lacking from the administrative law judge's decision, I am nonetheless convinced that remand is unnecessary. Although perhaps poorly explained, the administrative law judge's selection can be reconciled easily with the record, albeit on different grounds than defendant proposes.  Plaintiff testified that her newest problems with her arms and fingers started "about a year" before the hearing, which coincides roughly with the March 1, 2005 onset date chosen by the administrative law judge.  Further, it was in March 2005 that plaintiff began reporting generalized aches all over that were different from the neck and arm pain that she had been having.  As the administrative law judge noted, on March 16, 2005, Dr. Gilberg described plaintiff as impaired by a chronic pain syndrome.  This evidence reasonably supports the administrative law judge's determination that plaintiff's symptoms increased in severity on March 1, 2005.  Finally, the date chosen by the administrative law judge makes sense because a finding of disability requires the claimant to establish the existence of a disabling medically determinable impairment that has lasted or can be expected to last for a continuous period of not less than 12 months.  42 U.S.C. § 423(d)(1)(A).  March 1, 2005 was approximately 12 months before Dr. Gilberg issued her residual functional capacity assessment.

28

Furthermore, although the administrative law judge's remarks made clear that he viewed the evidence as documenting a progressive worsening of symptoms, plaintiff's lawyer asked very few questions of either plaintiff or the medical expert regarding plaintiff's limitations during any time period prior to the hearing, focusing his questions mainly on plaintiff's current condition.  As a result, plaintiff does not stand in a strong position to challenge the administrative law judge's choice of onset date.  "When an applicant for social security benefits is represented by counsel the administrative law judge is entitled to assume that the applicant is making his strongest case for benefits."  Glenn v. Secretary of Health and Human Services, 814 F.2d 387, 391 (7th Cir. 1987).  Even in these proceedings, plaintiff has taken an all-or-nothing approach, declining to argue in favor of any onset date except for one that is not supported by the evidence.  In the absence of any suggestion by plaintiff that a clear alternative to either her alleged onset date or the date selected by the administrative law judge exists and where the evidence in the record reasonably supports the administrative law judge's selection, I decline to remand this case simply so the administrative law judge can write a better decision.  Fisher v. Bowen, 869 F.2d 1055, 1057 (7th Cir. 1989) ("No principle of administrative law or common sense requires [this court] to remand a case in quest of a perfect opinion unless there is reason to believe that the remand might lead to a different result."); Shramek v. Apfel, 226 F.3d 809, 811 (7th Cir.

2000) ("[W]e give the [ALJ's] opinion a commonsensical reading rather than nitpicking at it.") (internal quotations and citation omitted).


ORDER

IT IS ORDERED that the decision of defendant Michael J. Astrue, Commissioner of Social Security, denying in part plaintiff's applications for Disability Insurance Benefits and Supplemental Security Income under the Social Security Act, is AFFIRMED.

Entered this 21st day of November, 2007.

BY THE COURT:

/s/

BARBARA B. CRABB
District Judge